**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RACHAEL SHAY, individually and on behalf of all others similarly situated,<br><br>　　Plaintiff,<br><br>　　　　v.<br><br>APPLE INC., a Delaware Corporation; APPLE VALUE SERVICES, LLC, a Virginia Limited Liability Corporation; and DOES 1 through 10, inclusive,<br><br>　　Defendant. | CASE NO.: 3:20-cv-01629-JO-BLM |

# Expert Report of Ronald T. Wilcox, Ph.D.
# November 18, 2022

# REDACTED

# Table of Contents

I.   Qualifications ............................................................................................. 1

II.  Case Background, Assignment, and Materials Considered ........................... 2

III. Summary of Conclusions ............................................................................ 4

IV.  Plaintiff Does Not Specify the Type of Disclosure Apple Should Have Provided Regarding the Purported Risk of Theft ...................................................... 6

V.   Consumers Would Vary in The Degree to Which They Would Consider A Disclosure of the Purported Risk of Theft in Their Purchase Decisions ........................... 8

    A.   Consumers Vary in the Factors They Consider When Making Gift Card Purchase Decisions ............................................................................................. 9

    B.   Many Consumers Rely on Own and Others' Positive Prior Experiences with iTunes Gift Cards When Making Purchase Decisions ........................................ 13

    C.   Consumers May Already Be Aware of the Risk of Gift Card Theft and Fraud When Making Purchase Decisions ................................................................ 16

VI.  Consumers Are Likely To Vary In Their Perceptions of the Purported Risk of Theft and Therefore Likely to Respond Differently to Any Disclosure From Apple .......... 17

    A.   Consumers Are Likely to Vary in Their Perception of the Purported Risk of Theft Due to any Disclosure from Apple ............................................................. 17

    B.   Consumers Vary in Their Risk Preferences and Are Therefore Likely to Respond Differently to a Disclosure of the Purported Risk of Theft ............................. 21

## I.    QUALIFICATIONS

1.     I am the NewMarket Corporation Professor of Business Administration at Darden Graduate School of Business Administration at University of Virginia, where I conduct research and teach classes related to marketing.  I received an Honors Bachelor of Arts degree in Classics and Economics from Xavier University and a Ph.D. in Business Administration (focused on marketing) from Washington University in St. Louis.  I have been at Darden since 2001.  Prior to that I was an Assistant Professor of Industrial Administration at the Graduate School of Industrial Administration (now Tepper School of Business) at Carnegie Mellon University.  I also served as an economist at the U.S. Securities and Exchange Commission from 1999 to 2000.

2.     Marketing is a discipline that is focused on the study of organizations' marketing practices based on conceptual foundations of consumer behavior.  My general areas of expertise within marketing are branding, consumer behavior, surveys, statistical modeling of consumer choice, and the public policy implications of marketing.  I have published several articles on these marketing phenomena in leading marketing journals such as the *Journal of Marketing Research*, *Marketing Science*, *Management Science*, and the *Journal of Business*.  My published peer-reviewed research includes articles on consumer financial decisions.  My study on consumer banking services was one of the "Top 5" cited papers in the *Journal of Marketing Research* in the 2006 to 2011 period.  I have also published a book on the declining U.S. household savings rate that was named a "Top 5 Business Book of the Year" by Kiplinger.[1]

3.     I have authored or supervised numerous cases and technical notes, published by Darden Business Publishing and used at other leading business schools, which focus on practical business problems regarding consumer expectations, and frameworks and techniques for solving these problems.  For instance, I supervised a case focused on consumers' responses to packaging and promotions for Heinz Ketchup.[2]  At Darden, I have taught MBA-level courses in marketing research and marketing intelligence.  These courses include modules focused on consumer

---

[1] Ronald T. Wilcox, *Whatever Happened to Thrift? Why Americans Don't Save and What to Do About It* (New Haven, CT: Yale University Press, 2008).

[2] Ronald T. Wilcox, *Heinz Ketchup:  Pricing the Product Line* (Darden Business Publishing, University of Virginia), UVA-M-0777.

perceptions. I currently teach the required marketing course in the MBA and Executive MBA programs as well as the elective course on pricing.

4.    Outside of academic journals, my research and writing have appeared in the *Wall Street Journal*, the *Washington Post*, *BusinessWeek*, *Fortune*, *Forbes*, and the *Weekly Standard*. I have also co-authored a book, *Marketing Analytics: Essential Tools for Data-Driven Decisions*, published by the University of Virginia Press in 2021, on the use of customer data to improve marketing decisions.

5.    From 2012–2018, I was a member of the Board of Directors of University of Virginia Community Credit Union. From 2015–2018, I chaired the Governance Committee of the Board. From 2006–2016, I was the faculty leader for the Senior Management Training Program for Navy Federal Credit Union. In that role, I led a group of Darden faculty who taught Navy Federal's senior management team, both at Darden and at Navy Federal's headquarters.

6.    I have served as a marketing consultant to consumer finance organizations such as Visa, PNC Bank, and Genworth, and several other companies such as Sikorsky, Pratt and Whitney, Johnson and Johnson, Talbots, Logistics Management International, and Illinois Tool Works. I have also served as an expert witness in cases where I opined on issues relating to marketing and consumer behavior. A copy of my curriculum vitae that provides a full list of my publications is attached as **Appendix A**. A list of my testimony in the past four years is attached as **Appendix B**.

## II.    CASE BACKGROUND, ASSIGNMENT, AND MATERIALS CONSIDERED

7.    This proposed class action relates to Apple's App Store & iTunes gift cards ("iTunes gift cards"). Plaintiff, Ms. Shay, claims that iTunes gift cards are "defective, unsecure[,] and easily subject to known fraud."[3] Plaintiff claims that, as a result, the iTunes gift cards "are targeted by thieves who electronically access the Apple gift cards at the point of sale and redeem the funds

---

[3] Second Amended Class Action Complaint for Damages and Equitable, Declaratory and Injunctive Relief, *Rachael Shay, on behalf of herself and all others similarly situated v. Apple, Inc., a Delaware Corporation; Apple Value Services, LLC, a Virginia limited liability corporation; and Does 1 through 10, inclusive*, January 28, 2021 ("Second Amended Complaint"), ¶ 22.

activated by the consumer" and that "[s]ubsequently, when a consumer attempts to load a newly activated Apple gift card, the gift card registers as 'redeemed' and is valueless."[4]

8.      Plaintiff contends that had she "known the truth about Defendants' defective gift cards, she would not have purchased it."[5]  Further, Plaintiff claims that "[h]ad Apple disclosed to Plaintiff and Class Members that Apple did not have adequate systems, policies, and security measures in place to secure customers' Apple gift card account information and Apple gift card funds, Plaintiff and Class Members would not have purchased the Apple gift cards."[6]

9.      Plaintiff proposes a nationwide class for certification including "[a]ll consumers who purchased an App Store & iTunes gift card in the United States from May 28, 2017 to the present, whose gift card was subject to a redemption attempt prior to activation, and whose gift card was redeemed by a third party prior to attempted redemption by the consumer or intended user."[7]  She also proposes a California subclass.[8]

10.     I have been asked by counsel for Apple Inc. and Apple Value Services, LLC (together, "Apple") to evaluate consumer purchasing behavior in order to assess whether consumers who make up the potential class and subclass would uniformly have been exposed to, reacted to, and had their purchase decision impacted by an affirmative disclosure[9] from Apple regarding the purported risk of "redemption prior to activation" and "[redemption] by a third party prior to attempted redemption by the consumer or intended user."[10]

---

[4] Second Amended Complaint, ¶ 18.

[5] Second Amended Complaint, ¶ 10.

[6] Second Amended Complaint, ¶ 30.

[7] Memorandum in Support of Plaintiff's Motion for Class Certification, *Rachael Shay, on behalf of herself and all others similarly situated v. Apple, Inc., a Delaware Corporation; Apple Value Services, LLC, a Virginia limited liability corporation; and Does 1 through 10, inclusive*, September 9, 2022 ("Motion for Class Certification"), p. 10.

[8] Motion for Class Certification, p. 10.  Throughout this report, for ease of exposition, I refer to potential class members, but my opinions also hold for potential California subclass members.

[9] In this report, I evaluate affirmative disclosure beyond that already on the iTunes gift card and iTunes gift card packaging.  For example, the iTunes gift card purchased by Ms. Shay indicated "[d]o not share your code with anyone you do not know" and the packaging indicated "[n]either Apple nor Issuer is responsible for any loss or damage resulting from lost or stolen cards or for use without permission."  Compendium of Evidence in Support of Plaintiff's Motion for Class Certification, *Rachael Shay, on behalf of herself and all others similarly situated v. Apple, Inc., a Delaware Corporation; Apple Value Services, LLC, a Virginia limited liability corporation; and Does 1 through 10, inclusive*, September 9, 2022 ("Motion for Class Certification, Compendium of Evidence"), Exhibit 1, pp. 7, 9.

[10] Motion for Class Certification, p. 10.

11.     I am being compensated at my standard billing rate of $900 per hour.  I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction.  I also receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter.  Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

12.     A complete list of materials which I considered in forming my opinions is attached as **Appendix C**.  In addition to these materials, I relied on my training, experience, and expertise in marketing and consumer behavior.

13.     My opinions expressed in this report are to a reasonable degree of professional and scientific certainty.  My work in this matter is ongoing, and I reserve the right to update my opinions as additional information becomes available.

## III.    SUMMARY OF CONCLUSIONS

14.     Plaintiff, Ms. Shay, does not specify the type of disclosure that she believes Apple should have provided regarding the purported risk of theft of iTunes gift cards that she alleges in the Complaint.  Ms. Shay does not specify what language should have been used in any such disclosure.  In addition, Ms. Shay does not specify the level of risk that should have been disclosed. ███████████████████████████████████████████████████████ ████████████████████████████████████████ Ms. Shay also does not specify whether this risk should be specific to the location or retailer where the gift card was purchased.

15.     Even if consumers were to read a disclosure of the purported risk of theft, they are likely to vary in the factors they consider when making gift card purchase decisions.  Industry research, third-party surveys, and academic literature describe several factors considered by consumers

---

[11] ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

when purchasing gift cards including the gift card design, personalization options, use case for the gift card (e.g., self-use or given as a gift to someone else), and environmental impact. Moreover, academic research shows that, when choosing between options within a category, consumers tend to focus on factors that differ sufficiently between options in that category. Plaintiff has not provided evidence on whether the purported risk of theft for iTunes gift cards differs from that for other types of gift cards. Therefore, the degree to which a disclosure of the purported risk of theft, if read and considered, would affect consumers' iTunes gift card purchase decisions would similarly vary across consumers and would differ depending on how the consumer considers this disclosure relative to other purchase factors.

16.     Consumers also vary in their prior experiences both with iTunes gift cards and other types of gift cards, including whether or not they had previously experienced the type of theft alleged by Plaintiff. Academic literature shows that consumers often rely on past choices and the outcomes of those choices to inform future purchase decisions. Because past purchases and experiences with gift cards, including consumers' experiences redeeming these gift cards, vary across consumers, how a consumer would evaluate a disclosure of the purported risk of theft in the context of past experience would similarly vary across consumers.

17.     In addition, many class members may have been aware of the potential for the type of gift card theft alleged by Plaintiff when they purchased an iTunes gift card yet purchased the gift card anyway. Some consumers, including Plaintiff, may have been aware of this type of theft because they had experienced it for Apple's or other retailers' gift cards. Consequently, the effect, if any, of a disclosure of the purported risk of theft on a consumer's iTunes gift card purchase decision may vary across consumers based, in part, on this prior awareness.

18.     Even if Apple were to offer and class members were to receive a disclosure of the purported risk of theft from Apple, potential class members would likely vary in their perception of that risk. Academic research finds that some consumers perceive the likelihood of low-incidence events, such as the purported risk of theft, as too remote to factor into purchase decisions. Because Plaintiff provides no evidence that the purported risk of theft for iTunes gift cards differs from that of other brands' gift cards, the low risk of theft may be common across brands' gift cards and, consequently, consumers may be even less likely to consider such risk of theft when making purchase decisions. Academic research also finds that consumers form

perceptions of the likelihood of uncertain events based on their unique prior experiences with similar uncertain events and that consumers form perceptions of risk based on environmental cues, such as those associated with where they are shopping for gift cards, and objective differences in the risk of financial loss, such as the denomination of the gift card as well as whether they will be able to dispute their purchase with a credit card company. Due to these differences across consumers, individualized inquiry would be necessary to determine how a potential class member would perceive any disclosure of the purported risk of theft.

19.    Even if all consumers were uniform in their perceptions of the purported risk of theft, which they are not, they would still likely not respond similarly to a disclosure of the purported risk of theft due to variation in their risk preferences. Specifically, academic literature shows that consumers vary in their degree of risk aversion and that risk aversion can vary with decision context and, to an extent, demographic characteristics. Consequently, consumers' purchase decisions would likely be impacted differently by a disclosure of the purported risk of theft.

## IV.    PLAINTIFF DOES NOT SPECIFY THE TYPE OF DISCLOSURE APPLE SHOULD HAVE PROVIDED REGARDING THE PURPORTED RISK OF THEFT

20.    As an initial matter, it is unclear what type of disclosure Plaintiff is suggesting that Apple should have made on its iTunes gift cards. That Plaintiff failed to specify this information is important, because the content and format may determine how consumers would react to the information.[12] In her deposition, Plaintiff states that Apple should "tell everyone that you buying a gift card is at your own risk" and that "[y]ou may not get the value of it."[13] In the Motion for Class Certification, Plaintiff also states that "[t]here is no warning on the gift card or packaging

---

[12] David W. Stewart and Ingrid M. Martin, "Advertising Disclosures: Clear and Conspicuous or Understood and Used?" *Journal of Public Policy and Marketing* 23, no. 2, 2004, pp. 183–192 at p. 185; Amos Tversky and Daniel Kahneman, "The Framing of Decisions and the Psychology of Choice," *Science* 211, no. 4481, 1981, pp. 453–458 at pp. 457–458; Raj Chetty et al., "Salience and Taxation: Theory and Evidence," *American Economic Review* 99, no. 4, 2009, pp. 1145–1177 at p. 1146.

[13] Deposition of Rachael Shay, August 9, 2022 ("Shay Deposition"), p. 110:1–7 ("Q. Okay. What facts do you believe that Apple should have told you about the security of its gift cards? A. I think they should tell everyone that you buying a gift card is at your own risk. You may not get the value of it.").

sleeve to look for signs of tampering before purchase."[14]  Beyond this, however, Plaintiff does not specify in what ways she believes Apple should have communicated the purported risk of theft to consumers.

21.     Plaintiff does not specify the language that should have been used in the disclosure or what level of purported risk should have been specified in the disclosure, which may not be uniform across all iTunes gift cards sold.  In particular, the level of purported risk may vary by location of purchase (e.g., retailer, neighborhood).  For example, Mr. Barker, financial fraud manager at Apple, testified about site-specific factors that may impact the purported risk of fraud or theft, such as degree of employee access to gift cards and where they are stored.[15]  Despite this, Ms. Shay does not specify whether the disclosure should have conveyed the aggregate purported risk or the risk specific to the retailer or geography.

22.     Although Plaintiff fails to specify the disclosure Apple should have made regarding the purported risk of theft of iTunes gift cards, in this report, I assess the impact of some disclosure of that purported risk.  Further, my understanding from counsel and deposition testimony of Mr. Luongo, director of Apple gift cards, is that the likelihood of the purported theft is quite small, significantly less than one percent.[16]

---

[14] Motion for Class Certification, p. 5.

[15] Deposition of Lincoln Barker, July 29, 2022 ("Barker Deposition"), p. 39:10–24 ("Q What is it about the positioning or placement of physical gift cards that may lend itself to vulnerabilities to fraud or theft? A It's not really the positioning or the placement; it's the people that are involved. It would be the employees that either replace the items or have access to the cards or where those cards are stored in their – on their property, their facility, in the back room, and who has access to those and at what given point. Q What types of education have you offered to those stores with regard to the issues? A The education I've offered is just around those questions that I mentioned earlier is for them to question who was in possession of those cards, who had access to those cards.").

[16] Luongo Deposition, p. 39:2–12 ("Q And sitting here today, sir, do you have any idea or notion or estimate, I should say estimate, of what that percentage might be? A My estimate – I don't have a number for sure. But my estimate would be that it would be very, very low because we – well, you know, it's – it would be – I don't know. I can't even estimate the percentage, but it would be very small. Q When you say very small, what do you have – are we talking about under one percent? A I think so, yeah.").

## V.   CONSUMERS WOULD VARY IN THE DEGREE TO WHICH THEY WOULD CONSIDER A DISCLOSURE OF THE PURPORTED RISK OF THEFT IN THEIR PURCHASE DECISIONS

23.     If a disclosure of the purported risk of theft were made available to consumers, some consumers may not be attentive to this disclosure.  Plaintiff's testimony provides such an example.  The packaging of the iTunes gift card that was allegedly subject to theft listed disclosures that highlighted the possibility of "loss or damage resulting from lost or stolen cards or for use without permission."[17]  However, Ms. Shay neither read nor paid attention to these disclosures, testifying that she did not read "anything on the back of the gift cards" during her purchase.[18]  As a result, it is not clear why Ms. Shay believes that she or other potential class members would have read a disclosure of the purported risk of theft during their iTunes gift card purchases, let alone changed their purchasing decisions because of it.

24.     Moreover, even if consumers were to read the disclosure from Apple, they are likely to vary in how they would weigh the purported risk of theft against other factors in their purchase decision.  As discussed below, consumers rely on different sources of information when purchasing iTunes gift cards, have different reasons for wanting to purchase an iTunes gift card, and synthesize information in different ways when making their purchase decision.  As a result, if potential class members were to read the requested disclosure of the purported risk of theft, and given that the purported risk of theft is low, consumers' reactions would vary for a number of reasons and, in fact, many consumers likely would not change their purchase decisions at all.  Consequently, individualized inquiry would be necessary to determine whether and how any potential class member may respond to a disclosure of the purported risk of theft of iTunes gift cards described by Plaintiff.

---

[17] Shay Deposition, Exhibit 4, p. 3.

[18] Shay Deposition, p. 73:11–15 ("Q. And you don't recall reading anything on the back of the gift cards before you decided to purchase them, correct? A. Correct."); Plaintiff Rachael Shay's Responses to Defendant Apple Inc.'s Requests for Admission, Set One, *Rachael Shay, on behalf of herself and all others similarly situated v. Apple, Inc., a Delaware Corporation; Apple Value Services, LLC, a Virginia limited liability corporation; and Does 1 through 10, inclusive,* September 30, 2022 ("Plaintiff Rachael Shay's Responses to Defendant Apple Inc.'s Requests for Admission, Set One"), p. 4 ("REQUEST FOR ADMISSION NO. 4: Admit that you did not read any statements on the packaging before deciding to purchase the two Apple iTunes gift cards you purchased from Walmart on April 3, 2020. RESPONSE NO. 4: … Deny. Plaintiff read the statement on the front of the packaging that she was purchasing a $25 and $50 gift card for the App Store & iTunes Store before purchasing the gift cards.").

## A.  Consumers Vary in the Factors They Consider When Making Gift Card Purchase Decisions

25.   Consumers vary in the factors they consider when making the decision to purchase a gift card.  Consumers who read the requested disclosure would weigh it against other factors in their purchase decisions.  As a result, given that the purported risk of theft is low, the degree to which a disclosure of the purported risk of theft would affect a consumer's decision to purchase an iTunes gift card would vary across consumers, and some consumers would likely not consider the purported risk at all.

26.   Industry sources, third-party survey research, and academic research show that consumers cite many different factors that influence their gift card purchase decisions and that there is heterogeneity in the gift card attributes consumers consider when making gift card purchase decisions.  Individual preferences for gift card attributes, such as packaging aesthetics, personalization options, brand loyalty rewards and discounts, and environmental impact, may vary by each consumer's preferences and use case.  As a result, each consumer's reaction to a disclosure of the purported risk of theft would similarly vary.

27.   Industry reports highlight examples of such differences in the factors consumers consider in gift card purchase decisions.  For example, when deciding to purchase gift cards, consumers differ in the extent to which gift card packaging and personalization options influence their purchase decision.  According to a 2021 survey from Fiserv, 69% of consumers believe a gift card's design and aesthetic is important when making a purchase, and 40% of consumers had made an impulse purchase because they liked a gift card's design.[19]  Based on this same survey, a majority of consumers also prefer personalization options such as the ability to select a specific design or add personalized text.[20]  Additionally, 55% of consumers prefer gift cards made from sustainable materials[21]; this consideration is echoed by Mr. Luongo, director of Apple gift cards,

---

[19] According to industry research, "consumers prefer to personalize the gift cards they are purchasing."  This includes, for instance, the ability to upload a photo to display on the gift card, receive customized packaging or textures for their gift cards, or purchase gift cards made from sustainable materials.  *See* "Gift Card Gauge: The Art of Gift Card Design – You Never Get a Second Chance to Make a First Impression," *Fiserv*, May 2021.

[20] "Gift Card Gauge: The Art of Gift Card Design – You Never Get a Second Chance to Make a First Impression," *Fiserv*, May 2021.

[21] "Gift Card Gauge: The Art of Gift Card Design – You Never Get a Second Chance to Make a First Impression," *Fiserv*, May 2021.

who testified regarding the importance of environmental friendliness in designing form factors.[22] However, not all consumers consider card design as part of their purchase decision. According to a Blackhawk Network consumer survey, 46% of respondents consider personalization options (e.g., personalized messages, pictures) "not at all important."[23] For respondents of the same survey, options to customize their gift card for a particular retailer were more important, with 63% of consumers responding that they are "very/extremely interested" in these options.[24] Thus, consumers would weigh a disclosure of the purported risk of theft against these other factors and given that such risk is very low, would differ in the relative weight they would place on the purported risk of theft.

28.     Moreover, consumers may differ in the extent to which they are choosing between different brands' gift cards. For example, some consumers may arrive to a store having already decided to purchase a particular retailer's gift card while others may only decide between retailers' gift cards while perusing the display at the gift card retailer. Academic research shows that, when choosing between options within a category, consumers tend to focus on factors that differ sufficiently between options in that category.[25] The type of theft alleged by Plaintiff has been cited throughout the gift card industry,[26] and Plaintiff has not provided any evidence that the purported risk of theft for iTunes gift cards differs from that for other gift cards. As a result, consumers may not weigh a disclosure of the purported risk of theft when deciding between iTunes gift cards and other types of gift cards.

---

[22] Luongo Deposition, pp. 53:24–54:12 ("Q Then you also wanted to make it efficient. Does that mean ease of use for the customer? A I would put ease of use for the customer is very important. But efficient I meant also we think about the cost, you know, and also environmental component; how can we be responsible with design. Q So whether or not it's a plastic card or recyclable card, what the consumer might be looking for in terms of that? A Exactly. We try to get ahead of what the consumers are looking for. So all of our cards are made out of paper, so there's no plastic; it's all recyclable. And so that was something we did because we thought it was the right thing to do, as an example.").

[23] "Get the Facts on Gift Cards," *Blackhawk Network*, April 6, 2020, p. 26.

[24] "Get the Facts on Gift Cards," *Blackhawk Network*, April 6, 2020, p. 26.

[25] Susan M. Broniarczyk et al., "Consumers' Perceptions of the Assortment Offered in a Grocery Category: The Impact of Item Reduction," *Journal of Marketing Research* 35, no. 2, 1998, pp. 166–176 at p. 167; Philip Kotler and Kevin Lane Keller, *Marketing Management*, 14th Edition (Upper Saddle River, NJ: Pearson/Prentice Hall, 2011), p. 280; K. S. Krishnan, "Incorporating Thresholds of Indifference in Probabilistic Choice Models," *Management Science* 23, no. 11, 1977, pp. 1224–1233 at pp. 1225–1226.

[26] See Section V.C.

29.     Consumers also vary in their use cases for gift cards, which also affects the factors they consider when making gift card purchase decisions.  Consumers may purchase gift cards for themselves, as a gift for others, or for other uses (e.g., business purposes).  In a 2019 Blackhawk Network survey, 59% of consumers had bought at least one gift card in the past year as a gift to give to someone else and 33% had purchased at least one gift card for self-use.[27]  In a 2021 Fiserv survey, nearly 70% of consumers reported that they primarily buy gift cards for other people such as for winter holidays or birthdays.[28]  Additionally, 63% of respondents had received a gift card that year as an incentive or award from their employer.[29]  These findings are consistent with Ms. Shay's varied use cases for her iTunes gift card purchases.  For example, Ms. Shay stated during her deposition that she would buy iTunes gift cards as birthday and Christmas gifts for her son, birthday gifts for other people, and for her husband's business.[30]

30.     Industry research and third-party surveys demonstrate that the use case influences the factors the consumer considers when making gift card purchase decisions.  For instance, consumers who purchase gift cards to use as gifts tend to regard convenience and ease of purchase as important purchase factors:  32% of physical gift cards are "purchased the same day they're given."[31]  Conversely, consumers who purchase gift cards to use themselves often do so to allow them to establish online account balances to "help[] with both their budgeting…[and to] provide[] an alternative to storing their credit or debit card information online."[32]  These self-use gift card purchasers tend to consider whether they can receive a gift card purchase discount (e.g., buy $100 in gift cards, get a $20 gift card free) or take advantage of a loyalty/rewards program.[33]

---

[27] "Get the Facts on Gift Cards," *Blackhawk Network*, April 6, 2020, p. 8.

[28] "19th Annual Prepaid Consumer Insights Survey," *Fiserv*, February 2022, p. 4.

[29] "19th Annual Prepaid Consumer Insights Survey," *Fiserv*, February 2022, p. 12.

[30] Shay Deposition, pp. 52:6–16 ("Q. When was the first time that you purchased an iTunes gift card? A. That's hard to say, but we've been purchasing them for years. I would say more frequently because as my son got to the age where kids had iPads and stuff, that was kind of our go-to birthday gift for kids. It was also our go-to birthday gifts for him. He was very much into apps on the phone and he had a phone since 8 years old."), 54:4–13 ("Q. So $50 or $100 would be – would be for something like a birthday gift, Christmas gift -- A. Yes. Q. -- something special like that? A. Yes. Q. What -- what -- what kind of occasions would you get a $25 gift card for? A. Birthday gifts for other people."), 121:9–17 ("Q. So your testimony today is that you -- you have not -- you can't recall purchasing any iTunes gift cards after April 2020; is that correct? MR. MURRAY: Objection. A. No, I mean -- THE WITNESS: Sorry. MR. MURRAY: Go ahead. A. I did for my husband's business.").

[31] "Get the Facts on Gift Cards," *Blackhawk Network*, April 6, 2020, p. 7.

[32] "19th Annual Prepaid Consumer Insights Survey," *Fiserv*, February 2022, p. 5.

[33] "19th Annual Prepaid Consumer Insights Survey," *Fiserv*, February 2022, p. 5.

Thus, when making gift card purchase decisions, consumers weigh purchase factors differently depending on use case, implying that the weight consumers would place on the low-probability purported risk of theft relative to other purchase factors would likely also differ by use case.

31.     For gift cards purchased as gifts, industry research also shows that the factors that influence purchase depend on whether the recipient is a friend or relative, on the one hand, or an employee, on the other hand. Family and friends tend to buy retailer-specific gift cards that they think the recipient would appreciate based on the recipient's tastes.[34] In contrast, employers find it difficult to make gift card purchase decisions that appeal to a wide array of their employees' tastes; this makes employers more likely to purchase general-use gift cards accepted at many retailers, than to purchase store-specific gift cards.[35] Thus, even among gift cards purchased as gifts, consumers weigh purchase factors differently depending on the gift card recipient and, consequently, are likely to differ in the relative weight, if any, they place on a disclosure of the purported risk of theft.

32.     Academic research confirms that consumers consider different factors based on the use case for the gift card they are purchasing. As described previously, when a consumer purchases a gift card for himself, the consumer may weigh economic or practical benefits (e.g., discounts). When a consumer purchases a gift card as a gift for someone else, however, the gift giver is seeking to reap the social or psychological benefits from the act of gifting; these benefits include signaling the importance or closeness of their relationship with the recipient.[36] In addition, academic research indicates that gift cards to non-luxury retailers or with more versatile use cases are most preferred regardless of whether a gift card is purchased for self-use or received as a gift; however, when purchasing a gift card as a gift for someone else, consumers tend to purchase gift cards to specific retailers or luxury stores based on their subjective view of what the gift recipient would view as desirable or what would reflect the recipient's preferences or

---

[34] "Get the Facts on Gift Cards," *Blackhawk Network*, April 6, 2020, p. 20.

[35] "Get the Facts on Gift Cards," *Blackhawk Network*, April 6, 2020, p. 20.

[36] John F. Sherry, "Gift Giving in Anthropological Perspective," *Journal of Consumer Research* 10, no. 2, 1983, pp. 157–168 at p. 158; Sherry Shi Wang and Ralf van der Lans, "Modeling Gift Choice: The Effect of Uncertainty on Price Sensitivity," *Journal of Marketing Research* 55, no. 4, 2018, pp. 524–540 at p. 524; Morgan K. Ward and Susan M. Broniarczyk, "Ask and You Shall (Not) Receive: Close Friends Prioritize Relational Signaling Over Recipient Preferences in Their Gift Choices," *Journal of Marketing Research* 53, no. 6, 2016, pp. 1001–1018 at pp. 1001–1002.

lifestyle.[37]  A purchaser may also choose to buy a gift card for use as a gift to reduce the possibility that the recipient might be disappointed with their gift, caused by a lack of knowledge about the recipients' preferences.[38]  The academic literature, thus, also provides evidence that consumers weigh different factors in their gift card purchase decisions depending on use case, and, as a result, are likely to also differ in the weight they would place on a disclosure of the purported risk of theft relative to other purchase factors by use case when, as here, the incidence of risk is low.

33.     In sum, consumers vary in the factors they consider during gift card purchase decisions based on their preferences and the use case for the gift card.  Because consumers would consider a disclosure of the purported risk of theft alongside other factors in their purchase decisions, and particularly given that the purported risk of theft is low, the relative weight that consumers would place on a disclosure of the low-probability purported risk of theft would vary widely across individuals.

### B.     Many Consumers Rely on Own and Others' Positive Prior Experiences with iTunes Gift Cards When Making Purchase Decisions

34.     Consumers rely on both their own past experiences and others' experiences, often recorded in reviews, to evaluate their purchase decisions.  Consumers who read a disclosure of the purported risk of theft are likely to weigh it against such experiences with iTunes gift cards.  Because consumers' past experiences vary, consumers would likely also vary in their reactions to a disclosure, given that the purported risk of theft is low.

35.     Academic literature finds that consumers' own past experiences are an important factor in their purchase decisions.  Consumers often rely on their past choices to inform future purchase decisions.  For example, academic research shows, across a variety of products, consumers are

---

[37] Kunter Gunasti and Ernest Baskin, "Is a $200 Nordstrom Gift Card Worth More or Less Than A $200 Gap Gift Card?  The Asymmetric Valuations of Luxury Gift Cards," *Journal of Retailing* 94, no. 4, 2018, pp. 380–392 at p. 383; Jeff Galak et al., "Why Certain Gifts Are Great to Give but Not to Get:  A Framework for Understanding Errors in Gift Giving," *Current Directions in Psychological Science* 25, no. 6, 2016, pp. 380–385 at p. 383; Ernest Baskin et al., "Why Feasibility Matters More to Gift Receivers than to Givers:  A Construal-Level Approach to Gift Giving," *Journal of Consumer Research* 41, no. 1, 2014, pp. 169–182 at p. 170.

[38] Caroline Graham Austin and Lei Huang, "First Choice? Last Resort? Social Risks and Gift Card Selection," *Journal of Marketing Theory and Practice* 20, no. 3, 2012, pp. 293–305 at pp. 295, 298.

more likely to purchase the brand that they previously purchased, rather than switching to a new option.[39]  While the reason for this phenomenon can vary by context, it may occur because consumers choose to minimize the cost of considering new information or because of positive past experiences with prior purchases.[40]  Consequently, consumers who have past experience with iTunes gift cards are likely to continue to purchase them, even if they read a disclosure of the purported risk of theft.

36.      Consumers vary in the extent of their past experiences with both iTunes gift cards and gift cards more generally.  First, consumers vary in the number of gift cards they have purchased. For example, Ms. Shay testified that she had purchased at least 100 iTunes gift cards.[41] Similarly, in online forums, some consumers reveal long histories of purchases.  One consumer wrote, "I've been buying iTunes gift cards at 15% off for years,"[42] another referenced his or her existing "stack of discounted iTunes credits,"[43] and a third mentioned that he or she had "bought these [iTunes gift cards] several times."[44]  Other consumers have more limited recent experience with iTunes gift cards, like one consumer who wrote in an online forum that they "hardly use iTunes gift cards anymore."[45]  Some may not have previously purchased iTunes gift cards. Similarly, consumers vary in the number of gift cards, of any type, that they have purchased.  In a 2019 Blackhawk Network survey, consumers reported purchasing 6.4 physical gift cards, on average, in the prior year, with 42% of consumers purchasing a physical gift card at least once

---

[39] John Deighton et al., "The Effects of Advertising on Brand Switching and Repeat Purchasing," *Journal of Marketing Research* 31, no. 1, 1994, pp. 28–43 at pp. 29, 37; Tülin Erdem and Baohong Sun, "Testing for Choice Dynamics in Panel Data," *Journal of Business & Economic Statistics* 19, no. 2, 2001, pp. 142–52 at pp. 148–150.

[40] Rui Cui et al., "Interrogating and redefining the concept of consumer inertia," *Journal of Consumer Behaviour* 20, no. 1, 2021, pp. 21–31 at pp. 24–25.

[41] Shay Deposition, p. 53:16–21 ("Q. Okay. So can you give me a rough estimate of how many times you've purchased an iTunes gift card prior to April of 2020?  A. It could easily have been over a hundred times.").

[42] "Apple Offering 10% Bonus When Adding Funds Directly to Apple ID," *MacRumors*, December 17, 2018, available at https://forums.macrumors.com/threads/apple-offering-10-bonus-when-adding-funds-directly-to-apple-id.2160970/#post-26918463.

[43] "PayPal on eBay Has $100 App Store & iTunes Cards on Sale for $85," *MacRumors*, February 9, 2018, available at https://forums.macrumors.com/threads/paypal-on-ebay-has-100-app-store-itunes-cards-on-sale-for-85.2105217/.

[44] "PayPal on eBay Discounts $100 App Store and iTunes Gift Cards to $85," *MacRumors*, November 19, 2018, available at https://forums.macrumors.com/threads/paypal-on-ebay-discounts-100-app-store-and-itunes-gift-cards-to-85.2155830/.

[45] "PayPal on eBay Currently Offering $100 iTunes Cards for $85," *MacRumors*, December 21, 2017, available at https://forums.macrumors.com/threads/paypal-on-ebay-currently-offering-100-itunes-cards-for-85.2096411/.

every three months.  However, in the same survey, 33% of consumers reported that they had not purchased any gift cards in the past year.[46]

37.    Second, consumers also vary in the extent of their past experience redeeming iTunes and other brands' gift cards.  For example, while Ms. Shay has purchased many gift cards, she testified that she did not observe the use of iTunes gift cards that she gave as gifts and has only redeemed an iTunes gift card herself "a handful" of times.[47]  Others, such as those who purchased frequently for self-use, may have redeemed iTunes gift cards more frequently.  In addition, consumers who have purchased other brands' gift cards will also vary in their experiences redeeming those gift cards, including whether they have experienced the type of theft alleged by Plaintiff with those gift cards.  Thus, consumers' reactions to a disclosure, which depends in part on past experience, will also vary.

38.    Consumers may also rely on others' experiences to evaluate their iTunes gift card purchases.  For example, academic research shows that consumers rely on both other customers' reviews and third-party reviews to evaluate some of their purchase decisions.[48]  iTunes gift cards are rated highly by both customers and third-party websites.  For example, on Amazon's website, the average customer rating for $50 iTunes gift cards was 4.8 out of 5 stars.[49]  Similarly, in 2019, WalletHub ranked iTunes gift cards as the seventh best gift card, based, in part, on popularity

---

[46] "Get the Facts on Gift Cards," *Blackhawk Network*, April 6, 2020, p. 6.

[47] Plaintiff Rachael Shay's Responses to Defendant Apple Inc.'s Requests for Admission, Set One, p. 8. ("Plaintiff lacks knowledge or information to admit or deny whether the persons to whom she gifted an App Store & iTunes gift cards could not redeem them."); Shay Deposition, pp. 57:25–58:15 ("Q. Have you – prior to April 2020, have you ever loaded funds from an iTunes gift card – have you ever received an iTunes gift card as a gift? A. Yes. Q. From whom? A. My husband. Q. Can you estimate prior to April 2020 how many times your husband had given you an iTunes gift card as a gift? A. Only a handful, like three. Q. About three times or so. And I assume that on each of these three occasions, you attempted to load the funds onto your Apple ID? A. Yes.").

[48] Judith A. Chevalier and Dina Mayzlin, "The Effect of Word of Mouth on Sales: Online Book Reviews," *Journal of Marketing Research* 43, no. 3, 2006, pp. 345–354 at p. 349; Philip Kotler and Kevin Lane Keller, *Marketing Management*, 14th Edition (Upper Saddle River, NJ: Pearson/Prentice Hall, 2011), pp. 138–139.

[49] iTunes gift cards are no longer sold on Amazon, because Apple introduced a new gift card that could be used for both digital and hardware purchases.  However, the product page, containing reviews, is still available on Amazon's website.  "Customer Reviews: App Store & iTunes Gift Cards," *Amazon*, available at https://www.amazon.com/App-Store-iTunes-Gift-Cards/dp/B00OOKDO4Q/ref=cm_cr_arp_d_product_top?ie=UTF8#customerReviews.  *See*, Luongo Deposition, p. 11:14–23 ("Q What -- my understanding, sir, is that at some point, the iTunes/app store gift cards were phased out, and Apple adopted use of a new card that would be used for not only the app store or music purchases, but also to actually purchase hardware, such as iPads, iPhones, Mac computers, and what have you; is that correct? A Yes. Q And about when did that transition happen? A That transition started in the U.S. end of July 2020.").

and customer experience at Apple.[50]  As a result, given that the purported risk of theft is low, many consumers would likely continue to purchase iTunes gift cards, even with a disclosure of such purported risk.

### C.   Consumers May Already Be Aware of the Risk of Gift Card Theft and Fraud When Making Purchase Decisions

39.     Consumers may be aware of the potential for the type of gift card theft alleged by Plaintiff when they purchase a gift card.  As a result, the effect of a disclosure from Apple would have varied across class members based on this awareness, given the low purported risk of theft.  Indeed, some class members may have been aware of the potential for the type of theft alleged by Plaintiff prior to purchasing their gift cards and purchased those gift cards despite that knowledge.

40.     Some consumers may have been aware of the purported risk of theft, based on prior experience with the type of theft alleged by Plaintiff, but still have chosen to purchase iTunes gift cards.  Deposition testimony indicates that Ms. Shay continued to buy both iTunes gift cards and gift cards from other brands even after she allegedly became aware of the purported risk of theft and allegedly experienced such theft.  For example, Ms. Shay testified that she purchased an Apple gift card after April 2020 for her husband's business.[51]  Similarly, Ms. Shay testified that she purchased "over 30" non-Apple gift cards since April 2020, for a variety of brands including Amazon, Roblox, Chipotle, Subway, and Jamba Juice.[52]  In addition to Ms. Shay, other consumers also continued to buy iTunes gift cards after becoming aware of the potential for loss; one consumer stated in an Apple Community forum that "[t]his has happened to me twice

---

[50] John S. Kiernan, "2020's Best Gift Cards," *WalletHub*, November 13, 2019, available at https://web.archive.org/web/20200111093834/https://wallethub.com/edu/cc/best-gift-cards/27133/.

[51] Shay Deposition, p. 59:16–21 ("Q. Have you purchased any Apple gift cards after April 2020? MR. MURRAY: Objection to form. A. The purchase that I made for my husband's business was after the fact under a business card with my name on it.").

[52] Shay Deposition, pp. 60:24–61:3 ("Q. Have you purchased any non-Apple gift cards since April 2020? A. Yes. Q. From whom? A. Amazon and Roblox."), 61:13–24 ("Q. Between these three types of non-Apple gift cards, how many of these gift cards would you estimate that you purchased since April 2020? A. I have purchased, let's see, over 30 actually. Now that I remember, I've done food restaurant gift cards as well. Do you want specifics on those? I've done like the Habit -- Q. Any other restaurants other than Habit? A. Chipotle, Subway, Jamba Juice.").

now."[53]  Finally, some potential class members may have experienced the type of theft alleged by Plaintiff for gift cards of other brands or types but still have chosen to purchase iTunes gift cards.

41.    In sum, prior to purchasing iTunes gift cards, many potential class members may have already been aware of the purported risk of theft for iTunes gift cards or other brands' gift cards. As evidenced by Plaintiff's and at least some other consumers' decisions to continue purchasing iTunes gift cards even after experiencing the purported theft, a disclosure from Apple regarding the purported risk of theft would likely have a varying impact on consumers' decisions to purchase iTunes gift cards.  For some, it likely would not have changed their purchase decision at all.

## VI.    CONSUMERS ARE LIKELY TO VARY IN THEIR PERCEPTIONS OF THE PURPORTED RISK OF THEFT AND THEREFORE LIKELY TO RESPOND DIFFERENTLY TO ANY DISCLOSURE FROM APPLE

42.    Even if Apple were to offer and class members were to receive a disclosure of the purported risk of theft from Apple, potential class members would likely vary in their perception of the purported risk of theft.  Moreover, even if potential class members were uniform in their perceptions of the purported risk of theft, their response to any such disclosure would vary due to differences in their risk preferences.

### A.    Consumers Are Likely to Vary in Their Perception of the Purported Risk of Theft Due to any Disclosure from Apple

43.    A consumer's reaction to a disclosure of the purported risk of theft will depend on the consumer's individual perception of that purported risk of theft, given the low purported risk of theft.  There are several reasons why consumers would vary in their perception of risk.

44.    First, the low likelihood of the purported theft has implications for how potential class members would interpret a disclosure of the purported risk of theft from Apple, and, if so, how they might incorporate the information into their iTunes gift card purchase decisions.  Academic research, in the context of consumers evaluating insurance, shows that consumers consider the

---

[53] Motion for Class Certification, Compendium of Evidence, Exhibit 21, p. 688.

probability of some outcomes to be "too low" to insure against, while they do consider it worthwhile to purchase insurance for higher probability events.[54] Indeed, some consumers disregard the possibility of low-probability events entirely in making purchasing decisions.[55] Further, as described previously, Plaintiff provides no evidence that the purported risk of theft for iTunes gift cards differs from that of other brands' gift cards.[56] Thus, the low purported risk of theft may be common across brands' gift cards, implying that consumers may be even less likely to consider such risk of theft when making purchase decisions.[57] Consequently, some potential class members are likely to disregard any disclosure of the low-probability purported risk of theft.

45.     Second, consumers form unique perceptions of risk and probabilities based on their unique prior experiences.  According to academic literature, individuals often form perceptions of risk and probabilities for an uncertain event based on how information about that event is similar to or different from the consumer's past prior experiences and knowledge.[58] In the context of iTunes gift cards, consumers would judge a disclosure of the purported risk of theft in light of their prior experience with iTunes gift cards, which varies across consumers in terms of frequency of purchase and satisfaction with prior purchases.[59] Consequently, when provided with a disclosure of the purported risk of theft, consumers will likely form different perceptions of this risk and will make purchase decisions based on those perceptions.

46.     Third, consumers' perceptions of risk likely also vary based on where they are shopping for gift cards.  Research in psychology demonstrates that individuals form judgments based on a number of factors beyond prior experiences, including environmental cues.[60] Some parts of the

---

[54] Paul Slovic et al., "Preference for Insuring Against Probable Small Losses: Insurance Implications," *The Journal of Risk and Insurance* 44, no. 2, 1977, pp. 237–258 at pp. 253–254.

[55] Daniel Kahneman and Amos Tversky, "Prospect Theory: An Analysis of Decision Under Risk," *Econometrica* 47, no. 2, 1979, pp. 263–292 at p. 282.

[56] See Section V.A.

[57] See Section V.A.

[58] Daniel Kahneman and Amos Tversky, "Subjective Probability:  A Judgment of Representativeness," *Cognitive Psychology* 3, no. 3, 1972, pp. 430–454 at p. 451.

[59] See Section V.B.

[60] Ben R. Newell and David R. Shanks, "Unconscious influences on decision making:  A critical review," *Behavioral and Brain Sciences* 37, no. 1, 2014, pp. 1–19 at p. 2; Natalia Karelaia and Robin M. Hogarth, "Determinants of Linear Judgment:  A Meta-Analysis of Lens Model Studies," *Psychological Bulletin* 134, no. 3, 2008, pp. 404–426 at p. 404.

judgment formation can be subconscious so that individuals do not even realize how the environmental cues affect this process.[61]  In the context of gift cards, consumers may use location- or retailer-specific environmental cues, such as suspicious activity in the store or retailer reputation, to form their perceptions of the purported risk of theft.  As a result, consumers would interpret a disclosure of the purported risk of theft in the context of such environmental cues.

47.      Fourth, consumers' perceptions of the purported risk of theft likely differ because of objective differences in the size of possible financial loss.  For example, consumers purchase different denominations of iTunes gift cards (e.g., $10, $25, $100).[62]  Given that consumers would experience lower financial loss for lower denomination cards in the event of the type of theft alleged by Plaintiff, consumers may continue to purchase such gift cards while eschewing higher denominator gift cards.  For example, despite Plaintiff's experience with iTunes gift cards and her understanding of the purported risk of theft, she states in her deposition that she "would never purchase [iTunes gift cards] over $25 in the future," leaving open the possibility that she may consider purchasing smaller denomination iTunes gift cards.[63]

48.      Fifth, consumers' perception of the purported risk of theft likely also differ by differences in payment method and, consequently, the recourse available to them in the event of fraud.  Consumers who purchased their iTunes gift card with a credit card can dispute the transaction with their credit card issuer in the event of the type of theft alleged by Plaintiff.[64]  Through this process, a consumer "requests that their credit card company remove an incorrect or fraudulent charge from their bill" because they never received the product they purchased, were unsatisfied with the quality of the product they purchased, or were unsatisfied with the merchant's customer

---

[61] Ben R. Newell and David R. Shanks, "Unconscious influences on decision making:  A critical review," *Behavioral and Brain Sciences* 37, no. 1, 2014, pp. 1–61 at p. 2; Natalia Karelaia and Robin M. Hogarth, "Determinants of Linear Judgment:  A Meta-Analysis of Lens Model Studies," *Psychological Bulletin* 134, no. 3, 2008, pp. 404–426 at p. 404.

[62] *See*, for example, Shay Deposition, p. 54:1–2 ("Q. So without going through every single one of those hundred purchases, was there a typical denomination that you bought those gift cards in? A. $25 was the most common and then we'd do $50 and $100 for specialer [sic] occasions – special occasions.")

[63] Shay Deposition, p. 108:21–25 ("And I'll tell you what, I would never purchase over $25 in the future because they can't support their customers who don't get the value of the money that they spend for their product.").

[64] Suresh Dakshina, "Don't get scrooged by gift cards," *Retail Leader*, December 12, 2017, available at https://retailleader.com/dont-get-scrooged-gift-cards.

service regarding the product.[65] To the contrary, consumers who paid cash for their iTunes gift card would not have this same recourse.

49.     Discussion on online forums contained in the exhibits to Plaintiff's Motion for Class Certification reveals an example of a consumer who successfully disputed their iTunes gift card purchase and received a refund from their credit card company. A discussant on Reddit stated "My best advice is to call ur [sic] bank and dispute the charges … . Worked for me."[66]



---

[65] Brianna McGurran, "How Do Credit Card Disputes Work?," *Experian*, February 18, 2021, available at https://www.experian.com/blogs/ask-experian/how-do-credit-card-disputes-work/.

[66] Motion for Class Certification, Compendium of Evidence, Exhibit 24, p. 891.

[67] Motion for Class Certification, Compendium of Evidence, Exhibit 6 at APL-SHAY_00000071.

[68] Motion for Class Certification, Compendium of Evidence, Exhibit 7 at APL-SHAY_00011423.

[69] Motion for Class Certification, Compendium of Evidence, Exhibit 7 at APL-SHAY_00011447.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████

51. Due to these differences across consumers, individualized inquiry would be necessary to determine how a potential class member would perceive any disclosure of the purported risk of theft.

### B. Consumers Vary in Their Risk Preferences and Are Therefore Likely to Respond Differently to a Disclosure of the Purported Risk of Theft

52. Even if all consumers were uniform in their perceptions of the purported risk of theft, which they are not, they would still likely not respond similarly to a disclosure of the purported risk of theft due to variation in their risk preferences. Specifically, academic literature shows that consumers vary in their degree of risk aversion. Risk aversion is a concept in economics and psychology that measures the degree to which a person engages in behavior with uncertain outcomes or potential for loss.[71] All else equal, Person A is said to be more risk averse (or exhibit a higher degree of risk aversion) than Person B if Person A would refuse to take risks that Person B would take.[72] Because consumers vary in their degree of risk aversion, potential class members are likely to respond differently to a disclosure of the purported risk of theft based on these risk preferences.

53. Academic literature has found that the degree of risk aversion varies across consumers. This finding has been shown to hold across a variety of contexts, both in real world settings and in laboratory experiments. Researchers have identified heterogeneity in risk preferences in the context of car insurance deductible choice,[73] game show contestants' decisions when faced with

---

[70] Motion for Class Certification, Compendium of Evidence, Exhibit 7 at APL-SHAY_00011449.

[71] Rui Mata et al., "Risk Preference: A View from Psychology," *Journal of Economic Perspectives* 32, no. 2, pp. 155–172 at p. 156.

[72] Renate Schubert, et al., "Financial Decision-Making: Are Women Really More Risk-Averse?" *American Economic Review* 89, no. 2, 1999, pp. 381–385 at p. 382.

[73] Alma Cohen and Liran Einav, "Estimating Risk Preferences from Deductible Choice," *American Economic Review* 97, no. 3, 2007, pp. 745–788 at p. 746.

risky choices,[74] experiments studying choice under uncertainty,[75] and health insurance plan selection.[76]  In addition, the academic literature identifies differences in risk aversion by sex,[77] age,[78] income,[79] wealth,[80] and education level.[81]

54.     Academic literature has also found that many individuals exhibit different risk preferences for different decisions.  For instance, one academic paper found that consumers are more risk averse when making homeowners' insurance deductible choices than when making car insurance deductible choices.[82]  Another academic paper found that 70% of individuals exhibit different degrees of risk aversion when they made decisions regarding five employer-sponsored insurance coverage plans and their 401(k) plan.[83]

55.     In sum, consumers exhibit heterogeneity in risk aversion, which varies by decision context and, to an extent, by demographic characteristics.  Consequently, even if consumers were

---

[74] Matilde Bombardini and Francesco Trebbi, "Risk Aversion and Expected Utility Theory:  An Experiment with Large and Small Stakes," *Journal of the European Economic Association* 10, no. 6, 2012, pp. 1348–1399 at p. 1368.

[75] Hans-Martin von Gaudecker et al., "Heterogeneity in Risky Choice Behavior in a Broad Population," *American Economic Review* 101, no. 2, 2011, pp. 664–694 at pp. 688–689; Glenn W. Harrison "Estimating Risk Attitudes in Denmark:  A Field Experiment," *Scandinavian Journal of Economics*, 109, no. 2, 2007, pp. 341–368 at Figure 1, p. 354.

[76] Liran Einav et al. "Selection on Moral Hazard in Health Insurance," *American Economic Review* 103, no. 1, 2013, pp. 178–219 at p. 203.

[77] Alma Cohen and Liran Einav, "Estimating Risk Preferences from Deductible Choice," *American Economic Review* 97, no. 3, 2007, pp. 745–788 at p. 746; Hans-Martin von Gaudecker et al., "Heterogeneity in Risky Choice Behavior in a Broad Population," *American Economic Review* 101, no. 2, 2011, pp. 664–694 at p. 689.

[78] Alma Cohen and Liran Einav, "Estimating Risk Preferences from Deductible Choice," *American Economic Review* 97, no. 3, 2007, pp. 745–788 at p. 746; Hans-Martin von Gaudecker et al., "Heterogeneity in Risky Choice Behavior in a Broad Population," *American Economic Review* 101, no. 2, 2011, pp. 664–694 at p. 689; Glenn W. Harrison "Estimating Risk Attitudes in Denmark: A Field Experiment," *Scandinavian Journal of Economics* 109, no. 2, 2007, pp. 341–368 at p. 362.

[79] Alma Cohen and Liran Einav, "Estimating Risk Preferences from Deductible Choice," *American Economic Review* 97, no. 3, 2007, pp. 745–788 at p. 746; Hans-Martin von Gaudecker et al., "Heterogeneity in Risky Choice Behavior in a Broad Population," *American Economic Review* 101, no. 2, 2011, pp. 664–694 at p. 689.

[80] Alma Cohen and Liran Einav, "Estimating Risk Preferences from Deductible Choice," *American Economic Review* 97, no. 3, 2007, pp. 745–788 at p. 746; Hans-Martin von Gaudecker et al., "Heterogeneity in Risky Choice Behavior in a Broad Population," *American Economic Review* 101, no. 2, 2011, pp. 664–694 at p. 689.

[81] Hans-Martin von Gaudecker et al., "Heterogeneity in Risky Choice Behavior in a Broad Population," *American Economic Review* 101, no. 2, 2011, pp. 664–694 at p. 689; Glenn W. Harrison "Estimating Risk Attitudes in Denmark: A Field Experiment," *Scandinavian Journal of Economics* 109, no. 2, 2007, pp. 341–368 at p. 362.

[82] Levon Barseghyan et al., "Are Risk Preferences Stable Across Contexts?  Evidence From Insurance Data," *American Economic Review* 101, no. 2, 2011, pp. 591–631 at p. 593.

[83] Liran Einav et al., "How General Are Risk Preferences?  Choices Under Uncertainty in Different Domains," *American Economic Review* 102, no. 6, 2012, pp. 2606–2638 at pp. 2609, 2633–2634.

uniform in their perceptions of the purported risk of theft, which they would not be, the extent to which consumers' purchase decisions would be affected by a disclosure of the purported risk of theft would vary across consumers.

Executed this 18th of November, 2022

Ronald T. Wilcox, Ph.D.

# Appendix A

**Ronald T. Wilcox**
Darden Graduate School of Business Administration
University of Virginia
100 Darden Blvd.
Charlottesville, VA 22906-6550
Phone (434) 243-5558  email:wilcoxR@darden.virginia.edu

## Current Positions

NewMarket Corporation Professor of Business Administration, Darden School of Business, University of Virginia. March 2011- current.

Associate Dean for Executive Degree Programs

## Previous Positions

Senior Associate Dean for Degree Programs, 2015-2019

Associate Dean of MBA for Executives and Chaired Professor (Darden), 2012-2015

Associate Professor - Professor of Business Administration (Darden), 2001 - 2011

Visiting Associate Professor of Business Administration, Cheung Kong Graduate School of Business, Shanghai, P.R. China, Summer 2004 and 2005.

Economist, U.S. Securities and Exchange Commission, 1999 - 2000.

Assistant Professor of Industrial Administration, Graduate School of Industrial Administration (now the Tepper School of Business), Carnegie Mellon University, 1996-2001 (on leave during Academic Year 99-00).

## Education

Ph.D. in Business Administration, Washington University, St. Louis, Missouri, December, 1996.

M.S. in Business Administration, Washington University, 1993.

Honors A.B. in Classics and Economics, Xavier University, 1990.

## Appendix A

**Books**

Venkatesan, Rajkumar, Paul W. Farris and Ronald T. Wilcox (2021), <u>Marketing Analytics: Essential Tools for Data Driven Decisions</u>, *University of Virginia Press*.

Venkatesan, Rajkumar, Paul W. Farris and Ronald T. Wilcox (2014), <u>Cutting Edge Marketing Analytics: Real Word Cases and Data Sets for Hands-on Learning</u>, *Pearson Education*.

Wilcox, Ronald T. (2009), "Private Enterprise's Role in Increasing Savings," in <u>Franklin's Thrift: The History of a Lost American Virtue</u>, B. Blankenhorn, B. Dafoe-Whitehead and S. Brophy Warren eds., *Templeton Press*, May 2009.

Wilcox, Ronald T. (2008), <u>Whatever Happened to Thrift? Why Americans Don't  Save and What to Do About It</u>, *Yale University Press*, May 2008. [Reviewed by *Wall Street Journal* and *Business Week*, Named "Top 5 Business Book of the Year" by Kiplinger]


**Peer-reviewed Journal Articles**

Zhang, Yi, Ronald T. Wilcox and Amar Cheema (2019), "The Effect of Student Loan Debt on Spending: The Role of Perceived Payment Difficulty, *Journal of Public Policy and Marketing*, August, 1-14.

Sun, Baohong, Ronald T. Wilcox and Ting Zhu (2007), "Ignoring Your Best Customer? An Investigation of Customer Satisfaction, Customer Retention and Their Financial Impact, *Journal of Relationship Marketing*, 6(3/4), 87-116.

Kamakura, W., et. al. (2005), "Choice Models and Customer Relationship Management," *Marketing Letters,* 16(3/4), 279-291.

Li, S., B. Sun, and R.T. Wilcox (2005), "Cross-selling Naturally Ordered Services: An Application to Consumer Banking Services," *Journal of Marketing Research,* May, 42, 233-239. ("Top 5" cited papers in *JMR* for 2006 – 2011 time frame)

Wilcox, R.T. (2005), "Developing Better Fee Structures for Mutual Funds," *Journal of Investment Management*, April, 3(1), 1-17.

Wilcox, R. T. (2003), "Bargain Hunting or Star Gazing: Investors' Preferences for Stock Mutual Funds," *Journal of Business*, 76(4), 645-663.

Wilcox, R.T. (2001), "Advertising Mutual Fund Returns: A Critical Analysis of a U.S. Securities and Exchange Commission Proposal to Change Advertising Law," *Journal of Public Policy and Marketing,* 20(1), 1-9.

Hsu, A. and R.T. Wilcox (2000), "Stochastic Prediction in Multinomial Logit Models," *Management Science,* 46(8), 1137-1144.

# Appendix A

Wilcox, R.T. (1999), "Experts and Amateurs: The Role of Experience in Internet Auctions," *Marketing Letters*, 11(4), 363-374

Chen Y., J.D. Hess, R.T. Wilcox, and Z. Zhang (1999), "Accounting Profits Versus Marketing Profits: A Relevant Metric for Category Management," *Marketing Science*, 18(3), 208-229.

Kim, B., K. Srinivasan, and R.T. Wilcox (1999), "Identifying Price Sensitive Consumers: The Relative Merits of Demographic Versus Purchase Pattern Information," *Journal of Retailing*, 75(2), 173-193.

Narasimhan C., and R.T. Wilcox (1998), "Private-Labels and the Channel Relationship: A Cross-Category Analysis," *Journal of Business*, 71(4), 573-600.

Chiang, J., and R.T. Wilcox (1997), "A Cross-Category Analysis of Shelf-Space Allocation, Product Variety and Retail Margins," *Marketing Letters*, 8(2), 183-191.

**Other Publications**

Reply Brief in Support of Respondents, Booking.com v. United States Patent and Trade Office. 19-United 46, 2020. *Supreme Court of the United States*.

"Pricing Strategy Optimization," (2017) with Boston Consulting Group, Four Course Specialization, *Coursera*. (https://www.coursera.org/specializations/uva-darden-bcg-pricing-strategy).

"How Heinz Got Retailers and Consumers to Accept a Larger Ketchup Bottle," *Washington Post*, April 3rd, 2015

"How the Portland Trailblazers Won Back Their Fans, *Washington Post,* July 14th, 2014.

"Should Chip Maker Nix Flavors to Up Efficiency," *Washington Post*, March 3rd, 2012.

"Why Some MBA's are Wildly Successful," *Forbes,* December, 2011.

"The Hidden Taxation of Wealthy Americans, *Forbes*, November, 2011

"The Complexity of Bidding for Government Contracts," *Washington Post*, September, 2011

"Understanding How to Value Customers," *Financial Times*, August, 2011

**Appendix A**

"How Close Can You Stand to a Software Giant?" *Washington Post*, August, 2011

"The Thrifty Gene," *Forbes,* March 24, 2009.

"Spending Won't Save Us," *Forbes*, Feb. 13, 2009.

"Increase Pay for Government Officials," *Forbes*, Dec. 10, 2008

"A Conservative for Obama," *Forbes*, Oct. 31, 2008

"American Optimists," *Forbes*, Nov. 21, 2008

"How to Save the Economy," *Forbes*, Nov. 11, 2008

"The Forgotten Issue," *Financial Week*, Nov. 20, 2008.

Laseter T., A. Taylor, and R.T. Wilcox (2003), "The Big, The Bad and the Beautiful, *Strategy + Business;* Booz, Allen, Hamilton, Winter.

"The Hidden Potential of Powerful Brands," *Batten Briefings*, The Batten Institute,  Fall.

"Using Conjoint Analysis to Develop Efficient Fee Structures," *Proceedings of the Sawtooth Software Conference on Quantitative Methods in Marketing Research.*

## Non-Published Papers

"Comfortably Numb: The Impact of Student Loan Debt on Price Sensitivity for Major Purchases (2018), with Y. Zhang, *working paper*.

"Mine Matter Most: The Self-reference Effect in Memory for Brands," (2012) with K. Sharpe and S. Kesebir. *working paper*.

Wilcox R. and Raj Venkatesan (2010), "Strategies for Customer Win Back," *working paper*.

Wilcox, R. and Kathryn Sharpe (2010), "Understanding the Decision to Consume Luxury Brands." *working paper,*

Harris, R.S. and R.T. Wilcox (2009), "The Making of Business Leaders,"

## Published Teaching Material

66 North: Built for Life (UVA-M-1017)

# Appendix A

Patagonia Inc. (UVA-M-0857)

Legal Aspects of Pricing (UVA-M-0856)

Brand Positioning Statements (UVA-M-0827)

J.C. Penney: Think Big (Case: UVA-M-0841)

Product Line Pricing (Technical Note: UVA-M-0813)

Route 11 Chips (Field Case: UVA-M-0810; Teaching Note UVA-M-0810TN and Spreadsheet UVA-M-0810RX)

SmartOps: Forging Smart Alliances (Field Case: UVA-M-0797; Teaching Note UVA-M-0797TN; Portfolio: 0797TNF)

Parsons Brinckerhoff: The Second Avenue Subway (A) (Field Case: UVA-M-0793)

Parsons Brinckerhoff: The Second Avenue Subway (B) (Field Case: UVA-M-0794)

Parsons Brinckerhoff: The Second Avenue Subway (C) (Field Case: UVA-M-0795)

Parsons Brinckerhoff: The Second Avenue Subway (Teaching Note: UVA-M-0793TN)

The Influence of Social Media on Purchase Decisions in High Involvement Categories (Technical Note: UVA-M-0786)

Retail Relay (Field Case: UVA-M-0784; Teaching Note: UVA-M-0784-TN; Spreadsheet S-M-0784; Instructor Spreadsheet S-M-0784TN)

H. J. Heinz (Field Case: UVA-M-0777; Teaching Note: UVA-M-0777TN; Portfolio UVA-M-0777TNX)

Portland Trail Blazers (Field Case: UVA-M-0773; Teaching Note UVA-M-0773-TN)

Dragon Systems (A)  (Field Case: UVA-M-0724)

Dragon Systems (B)  (Field Case: UVA-M-0725)

Big O Tires (Field Case: UVA-M-0692)

Big O Tires Teaching Note (UVA-M-0692TN-M) [Multimedia Teaching Note]

XM Satellite Radio (Public Source Case: UVA-M-0708)

Fidelity Inc.: Pricing the Blue Chip Growth Fund (Field Case: UVA-M-0674) [*Wachovia Award for Pedagogical Excellence*]

**Appendix A**

Fidelity Inc.: Pricing the Blue Chip Growth Fund *Teaching Note* (Case: UVA-M-0674TN)

NorthStar Consulting (Field Case: UVA-M-0673)

Mass Mutual Inc. (Public Source Case: UVA-M-0672) [Multimedia Case]

A Practical Guide to Conjoint Analysis (Technical Note: UVA-M-0675)

Methods for Producing Perceptual Maps from Data (Technical Note: UVA-M-0665).

Marketing Economics: Break-even Analysis and Contribution Margin (Technical Note: UVA-M-0648).


**Professional Presentations**

2012 Winter American Marketing Association, "Developing Protocols for On-line Panels"

2011 Winter American Marketing Association, "Bringing Finance into the Marketing Classroom,"

2007-2011 Speeches on <u>Whatever Happened to Thrift? Why Americans Don't Save and What to Do About It</u>, *Yale University Press* for National Co-op Bank, Visa, Genworth Financial, Navy Federal Credit Union, Financial Planners Society of Virginia, AARP, United Technologies, and various chapters of the University of Virginia Alumni Association.

2008 United Technologies, "Using Conjoint Analysis to Predict the Demand for New Technologies."

2004 Investment Company Institute Symposium on Mutual Funds: Business Strategies and Public Policy, "Distribution Strategies for Mutual Funds."

2004 Marketing Science Conference (Rotterdam, The Netherlands), "Cross-selling Naturally Ordered Services: An Application to Consumer Banking."

2004 Boulder Invitational Choice Symposium, "The State of the Art in Customer Lifecycle Analysis."

2004 Wharton Mutual Fund Conference, discussant on "Advertising and Mutual Funds."

2004 Batten Institute (Northern Virginia Series), "The New Science of Behavioral Finance."

# Appendix A

2002 Kenan-Flagler School of Business, University of North Carolina, "Individual-level Utility Estimation in Reduced-rank Experimental Designs: An Application to Mutual Fund Selection"

2002 Williams School of Business, Xavier University, "Rational Choice and the Mutual Fund Selection Decision."

2002 McIntire School of Commerce, University of Virginia, "Rational Choice and the Mutual Fund Selection Decision."

2001 Darden Graduate School of Business Administration, University of Virginia, "Understanding Investors Evaluation of Mutual Fund Fees."

2001 Marketing Science Conference (Frankfurt, Germany), "Understanding Investors' Evaluation of Mutual Fund Fees."

2000 Heinz School of Public Policy, Carnegie Mellon University, "Advertising Mutual Fund Returns: A Critical Analysis of a U.S. Securities and Exchange Commission Proposal to Change Advertising Law."

1999 Darden Graduate School of Business Administration, University of Virginia, "Bargain Hunting or Star Gazing? How Consumers Choose Mutual Funds."

1999 Kellogg School of Management, Northwestern University, "Bargain Hunting or Star Gazing? How Consumers Choose Mutual Funds."

1999 Sawtooth Software Advanced Research Forum (SanDiego), "Stochastic Prediction in Multinomial Logit Models: Applications to Conjoint Analysis."

1999 The U.S. Securities and Exchange Commission (Washington DC), "Bargain Hunting or Star Gazing? How Consumers Choose Mutual Funds."

1999 Association for Consumer Research Conference (Columbus), "Bargain Hunting or Star Gazing? How Consumers Choose Mutual Funds."

1999 Marketing Science Conference (Syracuse), "Stochastic Prediction in Multinomial Logit Models."

1998 Columbia Business School, Columbia University, "Efficient Fee Structures for Mutual Funds."

1998 Marketing Science Conference (INSEAD), "Efficient Fee Structures for Mutual Funds."

1997 Fall INFORMS Conference (Dallas), "A Cross-Category Analysis of Retailers' Promotional Strategies."

**Appendix A**

1997 Marketing Science Conference (Berkeley), "Signaling New Product Quality When Firms Have Reputations."

1996 Fall INFORMS Conference (New Orleans), "Private-Labels and the Channel Relationship: A Cross-Category Analysis."

1995 Marketing Science Conference (Tucson), "A Channel Theory of Private-Labels."


**Honors and Awards**

"Top 5 Business Books of 2008," *Kiplinger*

Wachovia Award for Excellence, Practitioner Publication (2008)
- In winning this award became only Darden faculty member to have received the faculty excellence award in three areas (peer-reviewed publication, practitioner publication and course materials)

Wachovia Award for Excellence, Publication in Peer-Reviewed Journal (2006)

Wachovia Award for Pedagogical Excellence in Course Materials, The Darden School, University of Virginia (2003)

British Petroleum Term Chair in Management Science, Graduate School of Industrial Administration, Carnegie Mellon University (2000)

Runner-up, Davidson Award for the best paper published in the *Journal of Retailing* (1999)

Recipient of a *Marketing Science Institute* research grant. (1999)

Clayton Award, *Marketing Science Institute* (1996).


**Consulting Activity – Representative Firms**

Cornerstone Research
Jones Day, LLC
Latham & Watkins, LLC
Debevoise & Plimpton, LLC
IRS
Jenner & Block, LLC
Sidley Austin, LLC

# Appendix B

**Ronald T. Wilcox, Ph.D.**                                                    November 2022

# Prior Testimony[1]

*Amazon.com, Inc. & Subsidiaries v. Commissioner of Internal Revenue*, United States Tax Court, Case No. 31197-12.  Deposed, August 2014. Testified at trial, December 2014.

*Ahmed D. Hussein v. Sheldon Razin et al.*, Superior Court of the State of California for the County of Orange, Case No. 30-2013-00679600-CU-NP-CJC. Deposed, June 2015.

*Infinity Sales Group, LLC v. Valassis Communications, Inc.*, United States District Court for Southern District of Florida, West Palm Beach Division, Case No. 9:15-cv-80463-Rosenberg/Hopkins. Deposed, June 2016.

*Morales et al. v. Kraft Food Group, Inc.*, United States District Court for the Central District of California, Case No. 2:14-cv-04387-JAK-PJW. Testified at evidentiary hearing, May 2017.

*Stephen Hadley et al. v. Kellogg Sales Company*, United States District Court for the Northern District of California, Case No. 5:16-cv-04955-LHK (HRL). Deposed, June 2018 and May 2019.

*Trinidad Lopez et al. v. Liberty Mutual Insurance Company*, United States District Court for the Central District of California, Case No. 2:14-cv-05576 BRO (JCx). Deposed, July 2018.

*Joyce Walker et. al. v. Life Insurance Company of the Southwest*, United States District Court for the Central District of California, Case No. 2:10-cv-09198-JVS-JDE. Deposed, October 2018.

*Monster Energy Ltd v. The Coca-Cola Company*, International Court of Arbitration, Case No. 01-18-0004-0759. Arbitration hearing, April–May 2019.

*Dennis Macdougal et. al. v. American Honda Motor Co. Inc. and Honda North America Inc.*, United States District Court for the Central District of California, Case No. 17-cv-1079. Deposed, May 2019.

*Seegert et. al. v. Rexall Sundown, Inc.*, United States District Court for the Southern District of California, Case No. 3:17-cv-01243-JAH-JLB. Deposed, June 2019.

*Hudock et. al. v. LG Electronics U.S.A, Inc.*, United States District Court, District of Minnesota, Case No. 16-cv-01220 JRT-KMM. Deposed, July 2019.

*Braverman et. al. v. BMW of North America, LLC.*, United States District Court for the Central District of California, Western Division. Case No. 8:16-CV-00966-TJH-SS. Deposed, September 2019.

---

[1] The party I worked for is underlined.

## Appendix B

*Paul Stockinger et. al. v. Toyota Motor Sales U.S.A Inc.*, United States District Court for the Central District of California. Case No: 17-cv-00035-VAP-KS. Deposed, November 2019.

*Patrick McMorrow et. al. v. Mondelez International, Inc.*, United States District Court for the Southern District of California. Case No: 3:17-cv-02327-BAS-JLB. Deposed, November 2019.

*Government of the United States Virgin Island v. Toyota Motor Corporation et al.*, In the Superior Court of the Virgin Islands Division of St. Thomas and St. John. Case No: ST-17-CV-218. Deposed, February 2020.

*Richard Sotelo et. al. v. Rawling Sporting Goods Company Inc.*, United States District Court for the Central District of California. Case No. 2:18-cv-09166-GW-MAA. Deposed, May 2020.

*Javier Cardenas et. al. v. Toyota Motor Corporation et al.*, United States District Court for the Southern District of Florida. Case No. 18-22798-CIV-MORENO. Deposed, November 2020.

*Asphericon GmbH v. Thorlabs Inc.*, United States District Court for the District of New Jersey, Case No. 2:15-cv-00679 (ES) (JAD). Deposed, November 2020.

*Lijie Mao v. Nissan Canada Inc. and Nissan North America Inc.*, Superior Court of Justice, Ontario, Canada. Case No. CV-19-00003730-00CP. Deposed, December 2020.

*District of Columbia v. Marriott International Inc.*, Superior Court for the District of Columbia, Case No. 2019 CA 004497 B. Deposed, March, 2021.

*Renee Cabrera et al. v. Google LLC*, United States District Court for the Northern District of California, San Jose Division. Case No. 5:11-cv-01263-EJD. Deposed, December 2021.

*Mark D. Chapman, et al. v. General Motors LLC*, United States District Court for the Eastern District of Michigan. Case No. 2:19-cv-12333-TGB-DRG. Deposed, June 2022.

*Lance Dutcher et al. v. Google LLC, d/b/a YouTube, and YouTube, LLC*, Superior Court of the State of California County of Santa Clara. Case No. 20CV366905. Deposed, July 2022.

*In re Fifth Third Early Access Cash Advance Litigation*, United States District Court for the Southern District of Ohio Western Division. Case no. 1:12-CV-00851. Deposed, July 2022.

*The People of the State of California v. HomeAdvisor, Inc. and Angi HomeServices, Inc.*, Superior Court of the State of California City and County of San Francisco. Case No.: CGC-18-565008. Deposed, October 2022.

*United States of America, et al. v. Google LLC*, United States District Court for the District of Columbia. Case No.: 1:20-cv-03010-APM. Deposed, October 2022.

# Appendix C

# Documents Considered List

**Academic Articles**

- Alma Cohen and Liran Einav, "Estimating Risk Preferences from Deductible Choice," *American Economic Review* 97, no. 3, 2007, pp. 745–788.

- Amos Tversky and Daniel Kahneman, "The Framing of Decisions and the Psychology of Choice," *Science* 211, no. 4481, 1981, pp. 453–458.

- Ben R. Newell and David R. Shanks, "Unconscious influences on decision making: A critical review," *Behavioral and Brain Sciences* 37, no. 1, 2014, pp. 1–19.

- Caroline Graham Austin and Lei Huang, "First Choice? Last Resort? Social Risks and Gift Card Selection," *Journal of Marketing Theory and Practice* 20, no. 3, 2012, pp. 293–305.

- Daniel Kahneman and Amos Tversky, "Prospect Theory: An Analysis of Decision under Risk," *Econometrica* 47, no. 2, 1979, pp. 263–292.

- Daniel Kahneman and Amos Tversky, "Subjective Probability: A Judgment of Representativeness," *Cognitive Psychology* 3, no. 3, 1972, pp. 430–454.

- David W. Stewart and Ingrid M. Martin, "Advertising Disclosures: Clear and Conspicuous or Understood and Used?" *Journal of Public Policy & Marketing* 23, no. 2, 2004, pp. 183–192.

- Ernest Baskin et al., "Why Feasibility Matters More to Gift Receivers than to Givers: A Construal-Level Approach to Gift Giving," *Journal of Consumer Research* 41, no. 1, 2014, pp. 169–182.

- Glenn W. Harrison et al., "Estimating Risk Attitudes in Denmark: A Field Experiment," *The Scandinavian Journal of Economics* 109, no. 2, 2007, pp. 341–368.

- Hans-Martin von Gaudecker et al., "Heterogeneity in Risky Choice Behavior in a Broad Population," *American Economic Review* 101, no. 2, 2011, pp. 664–694.

- Jeff Galak et al., "Why Certain Gifts Are Great to Give but Not to Get: A Framework for Understanding Errors in Gift Giving," *Current Directions in Psychological Science* 25, no. 6, 2016, pp. 380–385.

- John Deighton et al., "The Effects of Advertising on Brand Switching and Repeat Purchasing," *Journal of Marketing Research* 31, no. 1, 1994, pp. 28–43.

- John F. Sherry, Jr., "Gift Giving in Anthropological Perspective," *Journal of Consumer Research* 10, no. 2, 1983, pp. 157–168.

- Judith A. Chevalier and Dina Mayzlin, "The Effect of Word of Mouth on Sales: Online Book Reviews," *Journal of Marketing Research* 43, no. 3, 2006, pp. 345–354.

- K. S. Krishnan, "Incorporating Thresholds of Indifference in Probabilistic Choice Models," *Management Science* 23, no. 11, 1977, pp. 1224–1233.

# Appendix C

- Kunter Gunasti and Ernest Baskin, "Is a $200 Nordstrom Gift Card Worth More or Less Than a $200 Gap Gift Card? The Asymmetric Valuations of Luxury Gift Cards," *Journal of Retailing* 94, no. 4, 2018, pp. 380–392.

- Levon Barseghyan et al., "Are Risk Preferences Stable Across Contexts? Evidence from Insurance Data," *American Economic Review* 101, no. 2, 2011, pp. 591–631.

- Liran Einav et al., "How General Are Risk Preferences? Choices under Uncertainty in Different Domains," *American Economic Review* 102, no. 6, 2012, pp. 2606–2638.

- Liran Einav et al., "Selection on Moral Hazard in Health Insurance," *American Economic Review* 103, no. 1, 2013, pp. 178–219.

- Matilde Bombardini and Francesco Trebbi, "Risk Aversion and Expected Utility Theory: An Experiment with Large and Small Stakes," *Journal of the European Economic Association* 10, no. 6, 2012, pp. 1348–1399.

- Morgan K. Ward and Susan M. Broniarczyk, "Ask and You Shall (Not) Receive: Close Friends Prioritize Relational Signaling over Recipient Preferences in Their Gift Choices," *Journal of Marketing Research* 53, no. 6, 2016, pp. 1001–1018.

- Natalia Karelaia and Robin M. Hogarth, "Determinants of Linear Judgment: A Meta-Analysis of Lens Model Studies," *Psychological Bulletin* 134, no. 3, 2008, pp. 404–426.

- Paul Slovic et al., "Preference for Insuring Against Probable Small Losses: Insurance Implications," *The Journal of Risk and Insurance* 44, no. 2, 1977, pp. 237–258.

- Raj Chetty et al., "Salience and Taxation: Theory and Evidence," *American Economic Review* 99, no. 4, 2009, pp. 1145–1177.

- Renate Schubert et al., "Financial Decision-Making: Are Women Really More Risk-Averse?" *American Economic Review* 89, no. 2, 1999, pp. 381–385.

- Ronald T. Wilcox, *Heinz Ketchup: Pricing the Product Line* (Darden Business Publishing, University of Virginia), UVA-M-0777.

- Rui Cui et al., "Interrogating and redefining the concept of consumer inertia," *Journal of Consumer Behaviour* 20, no. 1, 2021, pp. 21–31.

- Rui Mata et al., "Risk Preference: A View from Psychology," *Journal of Economic Perspectives* 32, no. 2, 2018, pp. 155–172.

- Sherry Shi Wang and Ralf van der Lans, "Modeling Gift Choice: The Effect of Uncertainty on Price Sensitivity," *Journal of Marketing Research* 55, no. 4, 2018, pp. 524–540.

- Susan M. Broniarczyk et al., "Consumers' Perceptions of the Assortment Offered in a Grocery Category: The Impact of Item Reduction," *Journal of Marketing Research* 35, no. 2, 1998, pp. 166–176.

- Tülin Erdem and Baohong Sun, "Testing for Choice Dynamics in Panel Data," *Journal of Business & Economic Statistics* 19, no. 2, 2001, pp. 142–152.

Appendix C

## Books

- Philip Kotler and Kevin Lane Keller, *Marketing Management*, 14th Edition (Upper Saddle River, NJ: Pearson/Prentice Hall, 2011).

- Ronald T. Wilcox, *Whatever Happened to Thrift? Why Americans Don't Save and What to Do About It* (New Haven, CT: Yale University Press, 2008).

## Depositions

- Deposition of Lincoln Barker, July 29, 2022.

- Deposition of Rachael Shay and Exhibits, August 9, 2022.

- Deposition of Philip Luongo, August 19, 2022.

## Legal Documents

- Second Amended Class Action Complaint for Damages and Equitable, Declaratory and Injunctive Relief, *Rachael Shay, on behalf of herself and all others similarly situated v. Apple, Inc., a Delaware Corporation; Apple Value Services, LLC, a Virginia limited liability corporation; and Does 1 through 10, inclusive*, January 28, 2021.

- Memorandum in Support of Plaintiff's Motion for Class Certification, *Rachael Shay, on behalf of herself and all others similarly situated v. Apple, Inc., a Delaware Corporation; Apple Value Services, LLC, a Virginia limited liability corporation; and Does 1 through 10, inclusive*, September 9, 2022.

- Compendium of Evidence in Support of Plaintiff's Motion for Class Certification, *Rachael Shay, on behalf of herself and all others similarly situated v. Apple, Inc., a Delaware Corporation; Apple Value Services, LLC, a Virginia limited liability corporation; and Does 1 through 10, inclusive*, September 9, 2022.

- Plaintiff Rachael Shay's Responses to Defendant Apple Inc.'s Requests for Admission, Set One, *Rachael Shay, on behalf of herself and all others similarly situated v. Apple, Inc., a Delaware Corporation; Apple Value Services, LLC, a Virginia limited liability corporation; and Does 1 through 10, inclusive*, September 30, 2022.

## Public Press

- "Apple Offering 10% Bonus When Adding Funds Directly to Apple ID," *MacRumors*, December 17, 2018, available at https://forums.macrumors.com/threads/apple-offering-10-bonus-when-adding-funds-directly-to-apple-id.2160970/#post-26918463.

- "PayPal on eBay Currently Offering $100 iTunes Cards for $85," *MacRumors*, December 21, 2017, available at https://forums.macrumors.com/threads/paypal-on-ebay-currently-offering-100-itunes-cards-for-85.2096411/.

- "PayPal on eBay Discounts $100 App Store and iTunes Gift Cards to $85," *MacRumors*, November 19, 2018, available at

Page 3

# Appendix C

https://forums.macrumors.com/threads/paypal-on-ebay-discounts-100-app-store-and-itunes-gift-cards-to-85.2155830/.

- "PayPal on eBay Has $100 App Store & iTunes Cards on Sale for $85," *MacRumors*, February 9, 2018, available at https://forums.macrumors.com/threads/paypal on ebay-has-100-app-store-itunes-cards-on-sale-for-85.2105217/.

- Brianna McGurran, "How Do Credit Card Disputes Work?" *Experian*, February 18, 2021, available at https://www.experian.com/blogs/ask experian/how do credit card-disputes-work/.

- John S. Kiernan, "2020's Best Gift Cards," *WalletHub*, November 13, 2019, available at https://web.archive.org/web/20200111093834/https://wallethub.com/edu/cc/best gift-cards/27133/.

- Suresh Dakshina, "Don't get scrooged by gift cards," *Retail Leader*, December 12, 2017, available at https://retailleader.com/dont-get-scrooged-gift-cards.

## Websites

- "Customer Reviews: App Store & iTunes Gift Cards $50," *Amazon*, available at https://www.amazon.com/App Store iTunes Gift Cards/dp/B00OOKDO4Q/ref=cm_cr_arp_d_product_top?ie=UTF8#customerReviews.

## Industry Research

- "19th Annual Prepaid Consumer Insights Survey," *Fiserv*, February 2022.

- "Get the Facts on Gift Cards," *Blackhawk Network*, April 6, 2020.

- "Gift Card Gauge: The Art of Gift Card Design   You Never Get a Second Chance to Make a First Impression," *Fiserv*, May 2021.